J-S65025-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTOPHER EDWARD MILLER | : | |
| | : | |
| Appellant | : | No. 393 MDA 2019 |

Appeal from the Judgment of Sentence Entered, February 7, 2019,
in the Court of Common Pleas of Lancaster County,
Criminal Division at No(s): CP-36-CR-0005214-2017.

BEFORE: PANELLA, P.J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.: **FILED FEBRUARY 14, 2020**

Christopher Edward Miller appeals from the judgment of sentence imposed following his conviction of possession with intent to distribute ("PWID") and possession of a controlled substance.[1] We affirm.

This case arises from an incident which occurred in the early morning hours of September 17, 2017, in Lancaster, Pennsylvania. Miller and his cousin were attending a party at a bar when a fight broke out. When police arrived, several more fights broke out outside the bar. One such fight, involving Miller's cousin, occurred in the parking lot of a nearby convenience store. Police arrested several individuals, including Miller's cousin, and

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] *See* 35 P.S. §§ 780-113(a)(16), (30).

ordered the crowd to disperse from the convenience store parking lot. Police repeatedly directed Miller, who was visibly intoxicated, to leave the area; however, he refused to follow that directive, and repeatedly attempted to re-enter the convenience store parking lot that police were trying to secure. Police then arrested Miller for disorderly conduct. When police searched Miller incident to his arrest, they seized two bundles of heroin containing fentanyl and two rocks of cocaine from his front pants pockets, and four bundles of heroin containing fentanyl from his rectum. Police then charged Miller with PWID (heroin containing fentanyl), possession of a controlled substance (cocaine), and disorderly conduct.[2]

Miller moved to suppress the heroin and cocaine on the basis that police lacked probable cause to arrest him. On October 1, 2018, the trial court conducted a suppression hearing at which the Commonwealth presented the testimony of three members of the Lancaster City Bureau of Police; namely, Detective Sergeant Nathan Nickel, Officer Thomas Ginder, and Officer J. Hatfield. The Commonwealth also introduced video footage from the scene, which showed Miller's encounters with the officers. Miller testified on his own behalf, and argued, *inter alia*, that he was (1) attempting to inform the officers that his cousin was not at fault; (2) trying to locate family members; (3) returning to the convenience store to obtain cigarettes; and (4) was never

---

[2] The disorderly conduct count was charged as a misdemeanor offense under 18 Pa.C.S.A. § 5503(a)(4).

directed by police to leave the area. After considering the testimony, evidence, and arguments submitted by the parties, the trial court determined that police had probable cause to arrest Miller for disorderly conduct as a misdemeanor offense. Accordingly, on October 31, 2018, it denied suppression. In so doing, the trial court placed its findings of fact on the record, as follows:

1. At approximately 1:40 a.m. on the morning of September 17, 2017, . . . [p]olice were dispatched for a physical altercation occurring at Catalina's on Orange, which is bar/restaurant establishment located at 40 West Orange Street in the City of Lancaster.

2. Said establishment is located approximately one-half of a city block from the intersection of West Orange and North Prince Streets.

3. There is an A Plus gas station and convenience store located on the northwest corner of this intersection.

4. Upon arrival, the responding officers observed a large group of individuals milling about the area in question.

5. Witnesses at the evidentiary hearing have estimated the size of the crowd to have been approximately 30 to 70 people.

6. Shortly following the officers' arrival, a physical fight began between two males in the parking lot of the A Plus convenience store, near the gasoline pumps[.]

7. Detective Sergeant Nathan Nickel and Officer Eric McCrady . . . interceded in an attempt to stop this physical assault.

8. Detective Sergeant Nickel arrested one of the males involved in the fight, handcuffed him, and placed him on the curb in front of the store.

9. Based upon [Miller's] testimony, it appears that this individual is [his] cousin, whom had been in [Miller's] company shortly before this physical altercation.

10. It was during this period of time that Lt. Christopher Laser . . . directed officers to secure the parking lot of the A Plus convenience store and to prevent additional individuals from entering the parking lot.

11. Said actions were taken in an effort to deescalate the growingly hostile situation, to maintain the safety of the responding officers, and to preserve the public peace.

12. In response to Lt. Laser's directive, Officer Thomas Ginder and numerous other officers . . . attempted to secure the parking lot area of the A Plus convenience store.

13. During this time, the officers had repeatedly made verbal commands to individuals that they were not permitted entry in to the parking lot of the A Plus convenience store and repeatedly instructed members of the large crowd to dissipate and leave the area.

14. It is noted that Officer Ginder initially maintained his post securing the parking lot until a separate, third, physical altercation was reported on Prince Street, again within one-half a city block from the A Plus convenience store parking lot.

15. Officer Ginder responded to that altercation.

16. Once that altercation was quelled, Officer Ginder returned to his post to continue to secure the parking lot in question.

17. Officer J. Hatfield, who was accompanied by a police canine, also responded to the scene and parked his police vehicle in the parking lot of the A Plus convenience store.

18. Initially, Officer Hatfield attempted to dissipate the crowd directly outside of Catalina's on Orange.

19. While Sgt. Reich . . . gave the crowd verbal commands to leave the area, Officer Hatfield and his canine walked west on

West Orange Street, a major thoroughfare, in an effort to disperse the crowd from the vicinity of Catalina's on Orange.

20. Officer Hatfield then provided assistance in attempting to secure the parking lot of the A Plus convenience store.

21. At this time, Officer Hatfield was approached by [Miller], who attempted to enter the parking lot.

22. Officer Hatfield instructed [Miller] not to enter the parking lot and to leave the area.

23. [Miller] did not heed such commands; rather, [Miller] continued in an effort to get to one of the individuals whom had been involved in the fight near the gasoline pumps.

24. At this point, Officer Hatfield made eye contact with [Miller] and, again, directly instructed [him] to leave the area.

25. In response to such commands, [Miller] continued coming toward the fight.

26. At this point, [Miller] was located very closely to Officer Hatfield and his police canine.

27. [Miller] was in such close physical proximity to the officer so as to require Officer Hatfield to physically push [Miller] back, in an effort to protect [Miller] from the police canine, whom is trained to respond to persons in such close physical proximity to a handling officer even without command.

28. In response to said action, although having been told on two occasions to leave the property, [Miller] chose to linger near the side of the parking lot.

29. After approximately two minutes, [Miller] again attempted to reenter the parking lot.

30. In response thereto, Officer Hatfield, again, command[ed] [Miller] to leave the area and physically pushe[d] [Miller] backwards.

31. In response thereto, [Miller] smirked or laughed and indicated a desire to speak with his friend, whom had been placed into custody by Det. Sgt. Nickel.

32. Accordingly, at this time, Officer Hatfield physically attempted to escort [Miller] from the area.

33. Thereafter, [Miller] was observed attempting to sneak through the shrubbery area adjacent to the parking lot in a presumed effort to get to [cousin], [who] was in custody.

34. Officer Hatfield was also directed to respond to the separate physical altercation that had occurred on North Prince Street.

35. As officers struggled to restrain the participants in this separate fight, other [officers] gave repeated, loud verbal commands for people to leave the block.

36. Again, said efforts were made to secure the scene, prevent further violence, secure the safety of the officers, and maintain the public peace.

37. Even though officers were making such commands, Officer Hatfield again encountered [Miller], who was walking into the area of the second physical altercation on North Prince Street, rather than heeding the given commands to leave such area.

38. At this time, Officer Hatfield again made eye contact with [Miller] and told him to leave the area.

39. Said interaction occurred within three feet of the officers, whom were in the process of restraining the combatants from that physical altercation.

40. After that dispute was resolved, Officer Hatfield returned to continue securing the parking lot of the A Plus convenience store.

41. Officer Hatfield was, again, approached by [Miller], whom was attempting to enter the parking lot of the convenience store.

42. At this time, [Miller] was pointing directly at Det. Sgt. Nickel and his [cousin], [who] were near the store entrance.

43. [Miller] was, once again, in very close physical proximity to Officer Hatfield.

44. Accordingly, in light of the totality of [Miller's] actions, Officer Hatfield instructed other officers to arrest [him] and place him in custody for the misdemeanor offense of Disorderly Conduct.

45. [Miller] was then placed into custody by Officers Deibler and Burgett . . ..

46. During his arrest, [Miller] became verbally aggressive and physically resistant.

Trial Court Opinion, 6/3/19, at 7 -10 (citations to the record omitted).

The matter proceeded to trial. At the conclusion of trial, a jury found Miller guilty of PWID (heroin containing fentanyl), and possession of a controlled substance (cocaine), and not guilty of disorderly conduct. On February 7, 2019, the trial court sentenced Miller to an aggregate prison term of three and one-half to twelve years in prison.[3] Miller filed a timely notice of appeal. Both Miller and the trial court complied with Pa.R.A.P. 1925.

Miller raises the following issue for our review: "Did the [trial] court commit reversible error by refusing to suppress the items seized from [Miller's] person subsequent to his arrest, as the record reflects the police did not have probable cause to arrest?" Miller's Brief at 2.

_____

[3] We note that the trial court incorrectly states in its opinion that Miller was convicted solely of PWID, and sentenced to two and one-half to nine years in prison. *See* Trial Court Opinion, 6/3/19, at 2. However, the Sentencing Order indicates Miller was also convicted of possession of cocaine and sentenced to one to three years on that conviction, to run consecutively to the PWID sentence. Sentencing Order, 2/7/19, at 1.

On appeal from the denial of a suppression motion,

> Our standard of review . . . is whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. Our scope of review is limited; we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Galendez*, 27 A.3d 1042*,* 1045 (Pa. Super. 2011) (*en banc*) (citation omitted). Additionally, "appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pretrial motion to suppress." *Commonwealth v. Bush*, 166 A.3d 1278, 1281-82 (Pa. Super. 2017) (citation omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Id*. at 1282 (citation omitted).

In evaluating Miller's argument that he was subjected to an unlawful warrantless arrest, we are mindful that, to be constitutionally valid, a warrantless arrest must be supported by probable cause. *See Commonwealth v. Agnew*, 600 A.2d 1265, 1271 (Pa. Super. 1991).

> Probable cause to arrest exists when the facts and circumstances within the police officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested. Probable cause justifying a warrantless arrest is determined by the totality of the circumstances.

***Commonwealth v. Weaver***, 76 A.3d 562, 565 (Pa. Super. 2013) (citations omitted). Further, the question we ask is not whether the officer's belief was correct or more likely true than false; rather, we require only a probability, and not a prima facie showing, of criminal activity. ***See Commonwealth v. Williams, R.***, 2 A.3d 611, 616 (Pa. Super. 2010) (*en banc*).

The particular crime of disorderly conduct at issue in this matter is defined as follows: "[a] person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he . . . creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 18 Pa.C.S.A. § 5503(a)(4). With respect to grading, "[a]n offense under this section is a misdemeanor of the third degree if the intent of the actor is to cause substantial harm or serious inconvenience, or if he persists in disorderly conduct after reasonable warning or request to desist. Otherwise disorderly conduct is a summary offense." ***Id***. at § 5503(b).

Miller contends that the trial court erred in denying suppression because there was no evidence presented at the suppression hearing that he created a hazardous or physically offensive condition. Miller argues:

> In the instant matter, the record reflects that [Miller's] conduct did not create a hazardous or physically offensive condition. [Miller] largely complied with officers' orders to disperse. [Miller] appeared surprised and confused on the video following his first verbal and physical encounter with Officer Hatfield. Officer Hatfield did not shove [Miller] away from the scene but toward and [sic] officer with a suspect in custody, who [Miller] approaches without issue. [Miller] then again tried to get

- 9 -

to his cousin, not by concealing himself, but he walked directly toward Officer Hatfield. After this second physical confrontation, [Miller] stood outside of the secured area of the gas station parking lot. . . .

At the second location, [Miller] complied with officers' orders and can be seen on the video escorting his friends and family away. ***See*** N.T. 10/1/18 at 74-75; W. Orange and N. Prince Streets video at 1:52:27. When [Miller] again approached the gas station, he immediately complied with officers' orders. He did not gesture at the officers, but behind them. Behind the officers, bystanders were entering the convenience store and walking by where officers were placing [Miller's] cousin in handcuffs

Aside from the officers' testimony that the general conditions of fights with groups of bystanders tend to cause more fights, there was nothing about [Miller's] conduct which support a finding that his specific conduct created a hazardous condition. At no point was [Miller] aggressive or belligerent toward officers, even in the face of physical confrontation. [Miller] was not alleged to have been trying to engage other bystanders in unrest. [Miller] had legitimate reasons to remain near the gas station. [Miller] was a witness to the fight that broke out in front of the gas station and could provide relevant information with regard to that fight. If [Miller] had failed to speak to police at the scene, any pertinent and exculpatory information he could provide in relation to the fight with his cousin would be discredited. [Miller] was merely a bystander with a legitimate reason to be present, who was perceived as a threat to law enforcement purely because of his comparatively large size and not because of his conduct.

Miller's Brief at 11-12.

The trial court explained the basis for its denial of suppression as follows:

The court noted [Miller's] testimony that he was simply attempting to reach Detective Sgt. Nickel so as inform the detective that his cousin did not instigate the physical altercation by the gasoline pumps. Even were the court to find such testimony to be credible in nature, it, in no way, justifies [Miller's] repeated refusal of the officers' directives. Further, it is noted that the court finds much of [Miller's] testimony to lack credibility, including but not limited

- 10 -

to: averments that he was simply attempting to locate family members, averments that he returned to the convenience store to obtain cigarettes, and, most notably, averments that the officers had never directed him to leave the area and indicating that he willing would have done so if he had been requested by the law enforcement officers. It is specifically noted that [Miller] is [a] rather large individual, approximately 6'1" in height and 300 pounds in weight and demonstrated visible signs of intoxication during the early morning hours in question. The court noted that, during this relatively short episode, [Miller] attempted numerous times to encroach upon the law enforcement officers, whom were in the process of apprehending the individuals engaged in physical altercations, attempting to secure the parking lot of the A Plus convenience store, and attempting to restore the public order. Specifically, [Miller] encroached upon, and tried to move past, officers on at least five distinct instances within four minutes from 1:51 am to 1:55 am. Each time, [Miller] was specifically instructed to leave the area. On at least two occasions, [Miller] was in such close physical proximity to Officer J. Hatfield that Officer Hatfield had to push [Miller] backwards for [Miller's] own protection. This court found that [Miller] repeatedly ignored all such directives. Not only did [Miller] ignore the officers' commands, he also attempted on at least one occasion to surreptitiously enter that secured parking lot. Although [Miller] was neither yelling nor acting in a physically assaultive manner, the officers deemed [Miller's] actions to constitute a threat to the safety of the involved officers and a threat to the safety of other members of the public. It is clear that [Miller's] actions served no lawful purpose and distracted the officers from their lawful attempts to dissipate a hostile and chaotic environment.

Trial Court Opinion, 6/3/19, at 11-12.

Based on our review of the record, we conclude that the trial court's probable cause finding is amply supported by the totality of the evidence in the suppression record. The trial court, sitting as finder of fact, was free to disbelieve Miller's explanation for his conduct. **See Bush**, 166 A.3d at 1282. Moreover, probable cause must be viewed not from the perspective of the offender, but from the vantage point of a prudent, reasonable, cautious police

officer on the scene at the time of the arrest guided by his experience and training. *See Commonwealth v. Clark*, 735 A.2d 1248, 1252 (Pa. 1999).

The suppression record reflects that police officers were in the process of deescalating a chaotic and hostile environment, and restoring public order by apprehending the individuals engaged in multiple fights, and dispersing a crowd of thirty to seventy individuals. Miller, who was visibly intoxicated, continuously ignored police directives to leave the convenience store parking lot that police were attempting to secure, and instead kept trying to reenter that specific area. The officers did not need to establish that Miller intentionally created a hazardous condition. Rather, they merely needed to believe that his intoxication and refusal to comply with multiple police directives to leave the area established a probability that his continued presence created a hazardous condition to himself, the officers, and the public. *See Commonwealth v. Williams, R.*, 2 A.3d at 616 (holding that for probable cause we require only a probability, and not a prima facie showing, of criminal activity).

Because the officers had probable cause to arrest Miller for disorderly conduct, the search incident to the arrest was lawful. Thus, the court properly denied Miller's motion to suppress the fruits of that search.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 02/14/2020